RANDY S. GROSSMAN
Acting United States Attorney
JOHN N. PARMLEY
JONATHAN I. SHAPIRO
Assistant United States Attorneys
California State Bar Nos. 178885, 268954
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-8225
Email:  jonathan.shapiro@usdoj.gov

Attorneys for Plaintiff
The United States of America

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 20-CR-1809-LAB |
|---|---|
| Plaintiff, | |
| v. | UNITED STATES' SENTENCING MEMORANDUM |
| RUDY ALVAREZ, | Date: March 22, 2021 |
| Defendant. | Time: 2:30 p.m. |
| | The Honorable Larry Alan Burns |

## I.

## Introduction

The evidence at trial established that over a period of about 30 minutes, defendant Rudy Alvarez repeatedly shined a dangerously overpowered laser pointer at a San Diego Police Department helicopter that was flying over thousands of people who were marching downtown to protest police brutality. The pilot of the helicopter testified that the laser strikes were very bright in the cockpit, and he explained why such laser strikes are dangerous: "lasers are very dangerous for the pilots. It could ruin your eyes. Very

dangerous."[1] [Testimony of Blair Stephens, Trial Tr. p. 149.] In his post-arrest statement, Defendant admitted that he knew how powerful the laser was (having previously pointed it at his own eye) and that it was a "dumb" thing to do. He stated that he was intending to use the laser to prohibit security cameras from identifying individuals who were involved in the protests, especially if violence erupted as had happened several days before in La Mesa.  Indeed, the video of Defendant's conduct showed that he tried to hide the laser as he aimed it, further evidence that he knew it was dangerous. Finally, the Government's expert testified that the laser pointer was dangerously overpowered.

Accordingly, the evidence established that Defendant "recklessly endanger[ed] the safety of . . . an aircraft," and the applicable base offense level is therefore U.S.S.G. § 2A5.2(a)(2). Defendant is in a criminal history category I, yielding a range of 27-33 months. However, given Defendant's age (24 at the time of the offense), lack of criminal history, and positive work history, the United States recommends that the Court vary downward the equivalent of 3 levels and sentence Defendant to 18 months in custody. In the alternative, if the Court finds that 2A5.2(a)(2) does not apply, an upward variance to 18 months in custody is nevertheless warranted, given the defendant's dangerous conduct and the need to deter others from similar behavior.

//
//
//

---

[1] In 2007, to reflect the seriousness of the offense, Congress amended § 39A to include a maximum 5 years in prison. Congressman John Conyers explained:
> "Members of the House, when a laser is aimed at an aircraft cockpit, particularly at the critical stage of take-off or landing, it presents an imminent threat to aviation security and passenger safety. This has now been increasingly recognized, and we propose to do something about it today.
> According to the Federal Aviation Administration, laser illuminations can temporarily disorient or even disable a pilot during critical stages of flight. And in some cases, a laser might also cause permanent physical injury to the pilot."

153 Cong. Rec. H5551-01, 2007 WL 1484318

## II.
## Statement of Facts and Evidence

### A. Incident and Arrest

On June 4, 2020, at about 8:30 p.m., a large protest of thousands passed through the area of 500 University Avenue in San Diego. The San Diego Police Department Air Support Unit ("ABLE") monitored the crowd from above in a marked SDPD helicopter. SDPD Officers Stephens and Duarte were operating and observing in the helicopter. They watched as a demonstrator in the crowd shined a laser at their helicopter multiple times, impeding their ability to safely operate the aircraft. They captured this conduct on video and relayed a description of the suspect (male wearing a dark colored beanie hat, a long sleeve shirt, dark pants, and carrying a skateboard) to detectives on the ground. The suspect (later identified as Defendant) shined the laser at the helicopter multiple times over the course of the next thirty minutes. This video was played during the trial.

Stephens and Duarte coordinated with officers on the ground in an effort to identify and arrest Defendant. Eventually, Detective Rowlett observed Defendant shining a laser at an underpass. She followed him until others arrested him.

### B. Video and Dispatch Recordings of the Incident

The video from the helicopter showed that the helicopter crew was able to zoom in on Defendant as the source of a laser that was striking the helicopter. The camera zoomed in on Defendant wearing a beanie, a mask, a long-sleeved shirt and holding a skateboard in front of his chest. The video also shows that he has a ponytail. While the video camera was still aimed at Defendant, the video captured Defendant striking the helicopter with a laser multiple times. The evidence elicited at trial was that these strikes captured on video were only some of the strikes. Those were only captured when the camera was not in infrared mode. Officer Stephens testified that the helicopter was struck multiple other times which could not be seen on the video.

The video also showed that this protest was exceptionally large. The police helicopter was flying at low altitude over thousands of people for an extended period of time.

**C. Statement in Police Van**

After his arrest, Defendant was transported to SDCCU Stadium for processing. In the police van, a detective explained why Defendant was under arrest, stating: "Yeah, so obviously you are under arrest for pointing a laser at a helicopter. You can't do that bro." Defendant responded: "Yeah. I figured that."

**D. Search of Defendant**

Once at the stadium for processing, Detective Crawford conducted a search of Defendant incident to arrest. Detective Crawford found a gray metal laser pointer in Defendant's front left pocket.

**E. Post-Miranda Interview**

In a video-recorded interview at about 10:34 p.m., Detective Haughey advised Defendant of his *Miranda* rights. To summarize, Defendant admitted that he "pointed" the laser at the helicopter and wasn't really sure why he did it. He said his laser was green and that it was the same one police removed from his pocket. He said he bought the laser a couple of days earlier from Amazon to block security cameras from seeing faces. Defendant also said he wanted it for cats but doesn't own any. Defendant said he hadn't seen the news on people pointing lasers at helicopters. Defendant said he previously pointed the laser at his eyes and said it hurt his head and understood how it would make them feel when it was pointed at the helicopter.

Alvarez stated he saw a video from Hong Kong where they used lasers to keep cameras from seeing faces. Detective Haughey asked if that was in case they [San Diego protesters] started rioting or looting so cameras wouldn't catch their faces, and he responded, "Yeah, I guess." This comment came during a larger discussion of violent

protests which had taken place about one week earlier in La Mesa. During that protest, multiple buildings were burned down by protestors.

**F. Laser Expert**

FBI Special Agent Roahn Wynar, PhD, examined the laser seized from Defendant's pocket and testified that it was a laser pointer within the meaning of the statute. He also stated that it was dangerously overpowered. Noting that the laser had a warning label indicating output power of 5 milliwatts, Agent Wynar testified that his conservative analysis of the device showed it had an output of 70 milliwatts, making it "very, very overpowered . . . ." [Trial Tr., p. 277.]

### III.

### Discussion

U.S.S.G. § 2A5.2 is applicable to a conviction under 18 U.S.C. § 39A. Pursuant to § 2A5.2(a)(4), any conviction under § 39A results in a base offense level 9. However, "if the offense involved recklessly endangering the safety of . . . an aircraft," the base offense level is enhanced to 18 pursuant to § 2A5.2(a)(2). In United States v. Gardenhire, 784 F.3d 1277, 1280 (9th Cir. 2015), the Ninth Circuit held that it is the government's burden to prove by clear and convincing evidence that a defendant recklessly endangered an aircraft, and the court defined "'reckless' as 'a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation.'" (quoting U.S.S.G. § 2A1.4 cmt. n.1).

The evidence presented at trial provides clear and convincing proof that Defendant recklessly endangered the SDPD helicopter that he repeatedly struck with his laser. Defendant had subjective knowledge of the danger of his laser – he admitted that he previously pointed it at his own eye and that it hurt. The laser had a warning label affixed to it that clearly stated "DANGER." Defendant also had subjective knowledge that his laser was effective at distance – he admitted that he brought the laser to the protest to shine at surveillance cameras with the goal of rendering the cameras incapable of capturing images

of protesters. Defendant also admitted that his conduct was dumb. His conduct wasn't dumb because it was innocuous; it was dumb because it was dangerous, and he knew it.

Defendant's course of conduct further corroborates his subjective knowledge that he was striking the police helicopter and that he knew it was a dangerous nuisance. The context of Defendant's conduct is relevant. Defendant was participating in a Black Lives Matter protest of police violence two weeks after George Floyd died in the custody of a police officer who currently stands charged with second-degree unintentional murder in connection with the death. The Court can conclude from Defendant's conduct that he purposefully chose his target because it was a police aircraft, and the Court can find by clear and convincing evidence that Defendant repeatedly aimed his laser at the police helicopter over a period of about one half hour because he believed that he was successfully striking it and thereby undermining its ability to monitor the protest. The video of Defendant's conduct published at trial showed that Defendant held the laser close to his body in a surreptitious manner as he aimed it at the helicopter, further circumstantial evidence that he knew it was wrong (dangerous) to shine it at an aircraft. The fact that Defendant knew the helicopter was flying at night over a crowd of thousands of people only served to add to the risk that Defendant created with his conduct.

In United States v. Gardenhire, 784 F.3d 1277 (9th Cir. 2015), the Ninth Circuit determined that § 2A5.2(a)(2) was not applicable in a case involving a violation of 18 U.S.C.§ 39A that arose under very different facts. Notably, while the defendant in Gardenhire was told by a friend that the laser could blind people, id. at 1279, there was no evidence that the defendant shined the laser in his own eye. Moreover, the defendant's admissions established that he aimed his laser at the subject aircraft only a few times. Id. at 1280-81. Given only these facts, the Ninth Circuit concluded that there was "no evidence that supported a subjective awareness of the consequences of aiming a laser beam at an aircraft, and the bare admission that Gardenhire intentionally aimed the laser, knowing that it was dangerous to shine the laser in someone's eyes, does not support the inference the

district court drew—that he was aware of the dangers to the aircraft from doing so." Id. at 1283.

The Gardenhire court left open the possibility that the government could have provided circumstantial or direct evidence that the defendant was aware of the dangerousness of his conduct. Id. That is precisely what the trial in this case provides. Defendant knew the strength of his laser, not because somebody told him, but because he shined it in his own eye. He knew that his laser could disable surveillance cameras – that's why he brought it to the protest. He admitted that shining it at the helicopter was "dumb," further circumstantial evidence that he knew it was dangerous. Defendant repeatedly shined the laser at the helicopter over a period of about one-half hour, evidence that he knew he was successfully hitting and harassing the pilot (it would be pointless to do it otherwise). And he tried to hide his conduct, further evidence that he knew what he was doing was dangerous. Unlike in the Gardenhire case, the evidence in this case established that Defendant's laser was labeled with a warning sticker stating "DANGER." The facts developed at trial in this case establish by clear and convincing evidence that Defendant "was aware of the risk created by his conduct." Gardenhire, 784 F.3d at 1280, and he should be sentenced pursuant to U.S.S.G. § 2A5.2(a)(2).

## IV.
### Sentencing Recommendation

As discussed above, the court should apply 2A5.2(a)(2), which results in a guideline range of 27-33 months. Given the Defendant's lack of criminal record, family circumstances, and positive employment history, a variance to 18 months is appropriate.[2]

If the court does not apply 2A5.2(a)(2), the United States would nevertheless recommend the same 18-month sentence. The advisory guideline range of 4-10 months in that circumstance is too lenient and does not adequately address the sentencing factors set

---

[2] The United State does not recommend acceptance of responsibility, which is addressed in the United States' response to Defendant's guideline objection.

out in 18 U.S.C. § 3553. Such a low sentence would not reflect the seriousness of the offense, promote respect for the law, or afford adequate deterrence.

The bottom line is that Defendant knowingly purchased a laser to use at police protests to obscure the identities of protestors from cameras. He knew that the laser was powerful. He pointed it repeatedly at a police helicopter that was flying low at night over a group of thousands of people. This was dangerous, assaultive conduct that could have ended in tragedy. The pilot changed his eyewear to avoid further distraction and to protect his vision. A time-served or probationary sentence does not adequately address the seriousness and potential dangerousness of the conduct, nor does it address the underlying motives. This was not a childish prank. This was a dangerous intent to interfere with police officers who were doing their job to keep a large crowd safe.

Furthermore, a sentence lower than 18 months would not deter others. This is an ongoing, increasing problem. There was a deterrent value in bringing this prosecution in federal court. A sentence of 18 months would hopefully deter others from engaging in this conduct.

## V.
## Conclusion

For the foregoing reasons, the United States requests that the Court sentence Defendant to 18 months in custody, followed by 3 years of supervised release.

Dated: March 15, 2021

Respectfully Submitted,

RANDY S. GROSSMAN
Acting United States Attorney

/s/ *Jonathan I. Shapiro*
JOHN N. PARMLEY
JONATHAN I. SHAPIRO
Assistant United States Attorneys