| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | FOR THE SOUTHERN DISTRICT OF CALIFORNIA |

```
 4  UNITED STATES OF AMERICA,        )
                                     )
 5       Plaintiff,                  )  No. 20-CR-1809-LAB
                                     )
 6            v.                     )  March 22, 2021
                                     )
 7  RUDY ALVAREZ,                    )  2:45 p.m.
                                     )
 8       Defendant.                  )  San Diego, California
    _____  )
 9
```

```
10                    TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE LARRY ALAN BURNS
11                 UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
                            By:  JONATHAN I. SHAPIRO, ESQ.
14                               JOHN PARMLEY, ESQ.
                            880 Front Street
15                          San Diego, California  92101

16  For the Defendant:      FEDERAL DEFENDERS OF SAN DIEGO, INC.
                            By:  HOLLY A. SULLIVAN, ESQ.
17                          225 Broadway
                            San Diego, California  92101
18

19
    Court Reporter:         CYNTHIA R. OTT, RDR, CRR
20                          District Court Clerk's Office
                            333 West Broadway, Suite 420
21                          San Diego, California, 92101
                            cynthia_ott@casd.uscourts.gov
22

23

24

25  Reported by Stenotype, Transcribed by Computer
```

```
 1        SAN DIEGO, CALIFORNIA, MARCH 22, 2021, 2:45 P.M.

 2                          *  *  *  *

 3        THE CLERK:  Calling number 12 on the calendar,

 4   20-CR-1809, United States of America versus Rudy Alvarez.  If

 5   counsel could state their appearances for the record.

 6        MR. SHAPIRO:  Good afternoon, Your Honor.  Jonathan

 7   Shapiro and John Parmley for the United States.

 8        THE COURT:  All right.  Good afternoon.

 9        MS. SULLIVAN:  Good afternoon, Your Honor.  Holly

10   Sullivan, Federal Defenders, on behalf of Mr. Alvarez.

11        THE COURT:  All right.  Good afternoon.

12        (Pause.)

13        MS. SULLIVAN:  Mr. Alvarez is now present before the

14   Court, Your Honor.

15        THE COURT:  All right.  Good afternoon, Mr. Alvarez.

16        Mr. Alvarez is here having been convicted by a jury of

17   aiming a laser pointer at an aircraft.  A presentence report

18   was prepared, and I have reviewed it.  Have you gone over that

19   with your client, Ms. Sullivan?

20        MS. SULLIVAN:  Yes, Your Honor.

21        THE COURT:  There's a motion that's been filed to

22   dismiss for violation of the Commerce Clause.  That's been

23   responded to by the government.

24        The United States has filed a sentencing memorandum,

25   as has the defense.  I've read both, including the attached
```

1    letters from Mr. Alvarez's sister, and various friends and

2    people that have known him.

3              I also got attached a declaration from

4    Ms. Hudson-Bird, who interviewed some of the jurors who opined,

5    among other things, that Mr. Alvarez shouldn't go to jail.  And

6    that they didn't believe the case should have been brought in

7    federal court.

8              Both sides have filed sentencing -- actually, the

9    government filed a sentencing summary chart.  I think your

10   recommendation is contained within your memorandum.

11             And then there are objections to the presentence

12   report that have been responded to by the probation department,

13   and by the government.  The government's filed a response, and

14   probation has also filed an addendum.

15             Let me begin -- is there anything besides what I've

16   just recited that I should have considered?

17             MS. SULLIVAN:  No, Your Honor.

18             THE COURT:  Anything else, Mr. Shapiro?

19             MR. SHAPIRO:  No, Your Honor.

20             THE COURT:  Let's start with the motion.  I have read

21   and considered the motion.  Is there anything else you want to

22   say about that, Ms. Sullivan?

23             MS. SULLIVAN:  No, Your Honor.  I basically will

24   submit on the motion.  The only thing I would add is that when

25   you look at a somewhat sister statute, 18 USC 32(a)(5) and

1   (a)(8), it does require -- and it has that lacking element that

2   I'm arguing, that if it is a civil aircraft, that that civil

3   aircraft be used, operated, or employed in interstate,

4   overseas, or foreign air commerce.

5          So I do believe that that's the issue here, is that it

6   could be a civil aircraft that is not in interstate commerce.

7   It could be a drone.  And that's where I think the issue lies.

8          THE COURT:  How would you know that when the aircraft

9   is in flight, whether it had that status?  How would anybody

10  know that?  I mean, I live over by the airport, and I see

11  planes coming in all the time.  I'm sure some of them are

12  private.  Some of them are Navy planes out of North Island,

13  some of them are commercial planes.

14         But I have no idea whether they meet the standard that

15  you've just talked about by looking up in the sky, and seeing a

16  plane flying or -- a drone, I'd probably be able to distinguish

17  from a plane but -- or a helicopter, for that matter.

18         But, you know, the same applies to helicopters, which

19  is what the object was of the laser pointing in this case.  How

20  would one know that, know the status of it?

21         MS. SULLIVAN:  To be clear, Your Honor, it was not

22  that he couldn't be charged with the crime.  It would be an

23  issue that would be left to the state.

24         THE COURT:  We have an FAA that controls flight

25  regulation, nationally, right?

1      MS. SULLIVAN:  Correct.

2      THE COURT:  And whenever there's a crash, for example,

3 of an aircraft, the FAA comes in and does an investigation.

4 And they have preemptive jurisdiction over state and local

5 authorities, right?

6      MS. SULLIVAN:  Yes.

7      THE COURT:  So I'm wondering -- I mean, it seems like

8 a big deal that planes are in flight over areas of the United

9 States, such that the Congress has said, we think this is a

10 federal issue.  Doesn't that -- doesn't that suffice for the

11 necessary connection with commerce, such that the United States

12 can legislate and make this a federal offense?

13      All due respect to the four jurors who didn't think --

14 or the juror who didn't think it belonged in federal court, but

15 isn't that a reason that there is a commerce connection here?

16      I mean, otherwise, we'd have different rules in every

17 state.  And one traveling between states, you know, would have

18 to know what all the rules were, I assume.  You couldn't have

19 cross-country private flights that we have all the time,

20 because you'd be in airspace over some different state that

21 might have different rules, unless it were nationalized, as it

22 is.

23      MS. SULLIVAN:  Congress has the ability to include

24 that.

25      THE COURT:  Haven't they exercised it here by enacting

1  this, though?

2          MS. SULLIVAN:  I disagree with that.  And the reason

3  for that is because in other similar statutes, they have

4  specified that a civil aircraft must be in interstate commerce.

5          THE COURT:  Ah, okay.

6          What's the government's position on this?  Beyond what

7  you've written.

8          MR. SHAPIRO:  I've nothing to add, Your Honor.  If you

9  have any questions, I'm happy to answer them.

10          THE COURT:  Okay.  I don't.  As I said, the Court

11  finds that this is preemptive jurisdiction on the part of the

12  United States.  Congress recognized that, and exercised it when

13  it gave the federal courts the power to adjudicate cases

14  involving threats to aircraft in flight, one of which is

15  pointing a laser device at an aircraft or at a helicopter, as

16  happened in this case.  The motion to dismiss for the

17  violation -- purported violation of the Commerce Clause is

18  denied.

19          Let me turn to your objections now, Ms. Sullivan, to

20  the probation report, before I hear from you, generally.

21  You've asked me to give the defendant -- and there's not really

22  a -- this isn't really a factual objection.  You've just

23  objected that no one has offered him, Mr. Alvarez, acceptance

24  of responsibility?

25          MS. SULLIVAN:  No, Your Honor, my objection was that

probation did not recommend that. Probation deferred to the Court.

THE COURT: Okay. But that's not -- the objections under the rule, under Rule 32, have to be objections to factual matters. That's just a recommendation by them.

MS. SULLIVAN: Correct.

THE COURT: So I find it's not a proper objection. You can raise it again. I'm having a little bit of difficulty understanding how this can be the rare case where someone can contest their guilt, go to trial, a jury rules against them, and then, all of a sudden, they've manifested acceptance of responsibility.

I don't see that, but I'll wait to hear what you have to say about that. But I find it's not a proper legal objection. It's certainly something you can advocate. And so I'll hear from you again. That, in my judgment, resolves the purported objection. There weren't any others, right, just that?

MS. SULLIVAN: Correct.

THE COURT: Okay. I'm happy to hear from you, generally.

MS. SULLIVAN: Thank you, Your Honor.

I would note a few things. I'll go back to the guidelines first. Obviously, I understand the Court needs to accurately calculate the guidelines as a starting point in

1    determining what sentence should be imposed in this case.

2         And I would note that whether the Court agrees to a

3    downward adjustment for acceptance of responsibility or not,

4    Mr. Alvarez still has served more than the low end of the

5    guideline range, either with or without.  Either in a zero to

6    six-month, or a four to 10-month range.  And he has served four

7    months and 14 days, I believe is my calculation and probation's

8    calculation at this point.

9         Both myself and probation recommend that he receive a

10   time served sentence at this point.  I am asking the Court to

11   impose a downward adjustment for acceptance of responsibility.

12   And that's looking to his pretrial conduct.

13        Mr. Alvarez very quickly accepted responsibility as

14   soon as he was arrested.  He did not flee.  He did not -- he

15   was not combative in any way with officers.  He waived his

16   Miranda rights.  He spoke with officers, both in the transport

17   van going to Qualcomm, and -- I'm sorry, I'm forgetting, off

18   the top of my head, what Qualcomm is called now, but whatever

19   Qualcomm is now called --

20        THE COURT:  Demolished.  That's what it's called.

21        MS. SULLIVAN:  A hole.  Then once he was taken to that

22   station, he then waived his Miranda rights, and made full

23   statements from how he purchased the laser, to use of the

24   laser, and him not knowing that the laser would cause any

25   danger, or that it would even reach the helicopter.

He made all those statements.  He also answered
questions, frankly, that were outside of the reasons for his
arrest.  He answered questions about the -- his ability to find
out information about the protest, the advertising for the
protest, and how he even learned about any of that information.

So I do think all of that is something the Court
should consider.  He has been sincere and contrite since the
time of his arrest.  He continued that with the probation
officer.  We let probation know -- I forwarded the transcript
of his post-Miranda statement to the probation officer.  And he
agrees that that post-Miranda statement is, in fact, truthful.

And additionally, this is not a typical border case.
There has been significant litigation, including issues at
trial of knowledge and mens rea.  So I do think, considering
all of those, that the Court should grant a downward adjustment
for acceptance of responsibility.

THE COURT:  All right.

MS. SULLIVAN:  I also would note that the government
did not object to the presentence report, so they have waived
the request for the specific offense enhancement for reckless
endangerment of the officers.

THE COURT:  I disagree with that.  Again, the
objections are to factual matters.  Each side could come in and
say, look, we have a different theory, or we think, legally,
this section applies, rather than, you know, a different one.

1    Just as I mentioned with the acceptance of responsibility, that

2    wasn't a proper objection under the rule.  But they can come in

3    and advocate a different guideline.  And they've done that in

4    their -- in their papers.

5         MS. SULLIVAN:  Well, but it's different, because the

6    burden is on the government.  And the government needs to show,

7    by clear and convincing evidence, because of that enhancement.

8         THE COURT:  No, I disagree with you.  I mean, they

9    have to show, by clear and convincing evidence, if they want

10   some adjustment above about six levels.  But they're saying,

11   wait a minute, the probation department and the defense are

12   arguing the wrong provision of the guidelines.

13        They're arguing, just pointing a laser up at an

14   aircraft, whereas the guidelines provide for double that

15   starting offense level if it recklessly endangered the safety.

16   And I'm entitled to take into consideration the testimony of

17   people who testified about the effect of the laser, and likely

18   consequences of a laser hitting a pilot in the eye while the

19   aircraft is in the air.

20        With all respect to the probation officer, he or she

21   wasn't here to hear the testimony.  He didn't hear how they

22   were close to airspace, commercial airspace, in and out, and

23   that the laser in the eyes of the helicopter pilot, you know,

24   could have easily caused the pilot to venture into commercial

25   space.  And there would have been an accident.

1    So, you know, to get it from somebody who wasn't here,

2 and didn't hear the evidence, doesn't strike me as particularly

3 persuasive.  But I think it's fine for the government to raise

4 that at this point.  I don't see a problem with that.  They

5 haven't waived anything, to say that a different guideline

6 applies to this.

7    Just as you haven't, when you say, look, I think he's

8 entitled to acceptance of responsibility, notwithstanding the

9 government's refusal to recommend that.

10    MS. SULLIVAN:  I disagree with the Court, but I also

11 believe that that enhancement is inapplicable in this case.

12    THE COURT:  Why?

13    MS. SULLIVAN:  The reason why I believe it's

14 inapplicable is because it is very similar to the Gardenhire

15 case, the Ninth Circuit case from 2015.  In that case, the

16 defendant pointed a laser beam at a Cessna Citation jet.  Other

17 than the original shock of the laser, which is similar in this

18 case, no harm was done to the pilot.

19    THE COURT:  Did he do it multiple times in that case?

20    MS. SULLIVAN:  I believe so, yes.

21    THE COURT:  Are you sure about that?  I mean, the

22 evidence here was that multiple times, the laser was pointed up

23 at the helicopter pilot.

24    MS. SULLIVAN:  That's correct.

25    THE COURT:  Yeah.  I'm not sure, in that case, that

1    that happened more than once.  Not that that's dispositive, but

2    it's a factor --

3          MS. SULLIVAN:  I don't know for sure if it happened

4    more than once.

5          THE COURT:  Yeah, it's a factor.

6          MS. SULLIVAN:  My recollection of that case was that

7    it did happen multiple -- in multiple instances.  But the

8    beliefs of the defendant in Gardenhire are the same as the

9    beliefs of Mr. Alvarez, according to his post-arrest

10   statements, that the laser couldn't reach the jet.  He did not

11   believe the laser could reach the helicopter.  He didn't ever

12   see the laser strike the jet, the same as here.  He also didn't

13   think about the dangers of pointing a laser at an aircraft,

14   which is the same here as Mr. Alvarez.

15         The government noted that Mr. Alvarez admitted that,

16   at one point, he shined a laser -- that laser into his face.

17   And that it hurt his eyes a little.  I think that actually cuts

18   against the government's argument, because if you do believe

19   that a laser is going to reach a helicopter or an aircraft

20   that's a mile away in the air, you're less likely to shine that

21   laser directly into your eyes from a close distance.

22         Additionally, I would note that both in the Gardenhire

23   case and in our particular case, there was testimony -- expert

24   testimony concerning how the laser widens as it travels.  So

25   that it reaches a far greater distance, and becomes

1   substantially more dim as it travels back.

2           THE COURT:  As it diffuses.  Yeah, I remember that.

3           MS. SULLIVAN:  Yes.  So in both of those cases, both

4   in Gardenhire and in Mr. Alvarez's case, that information is

5   there.

6           Additionally, the pilot in this case, as soon as

7   they -- they started recording, so I don't know if the Court

8   recalls, but there are two different cameras that they have on

9   the helicopter.  And as soon as there was a laser strike, it

10  lights up the cockpit.  They start recording, and they switch

11  to different glasses.

12          So the pilots did not go out of the area in this case.

13  They didn't land.  There was no further harm.  There was

14  nothing to show that they filed a claim of any harm, or

15  anything like that that happened.  But most importantly,

16  Mr. Alvarez was unaware of that harm.  And he was made aware of

17  the potential harm to the pilot as soon as he was brought in

18  the van, and told so by the officer.

19          And his response to that was that he didn't know, and

20  that he was sorry.  So because of that, I don't believe that

21  the reckless endangerment enhancement should apply in this

22  case.

23          Mr. Alvarez has no criminal history.  I would note as

24  well that his sister, Carissa, and his girlfriend, Violet, as

25  well as other friends and family are present in court.  As the

1    Court is well aware, I'm limited to five letters in support,

2    but I received multiple letters from people that have known

3    Mr. Alvarez for an extended period of time.  And all of the

4    letters show that he is the same character and the same person.

5            And that's a person who the Court can determine by

6    reading through the presentence report, by reading through the

7    letters, by reading through the sentencing memorandum.  He is a

8    young, shy man who, although as I noted in the sentencing

9    memorandum, has a background that I think you could carry quite

10   a chip on your shoulder because of that, he doesn't.

11           He was a person that was relying on the school system

12   in order to have food as he was growing up.  There were some

13   fairly significant mental health issues at a very young age.

14   And having someone with those types of mental health issues at

15   that young of an age is rare.  So it shows the type of home

16   that he was living in, and the type of abuse that he was a

17   victim of.

18           Instead of being a person that stole in order to

19   support himself, or committed theft, or did anything, frankly,

20   that was against the law, he instead became a mentor at his

21   church, and became very involved in the church.  He moved away

22   from that family and became part of Violet Taylor's family, his

23   girlfriend's family.

24           He has been a strong worker.  He is an advocate for

25   animal rights, and an environmental advocate.  And he has

1   become both appreciative and a strong member of that family.

2   He has been told that when he is released from custody, he has

3   his job back.  He's been a hard worker and has had no issues.

4        Because of all of that, I would like the Court to

5   consider that further custody time is not appropriate in this

6   case.  It would be a good idea for Mr. Alvarez to continue on

7   his productive law-abiding life.

8        Obviously, it will become slightly more difficult for

9   him with a felony conviction on his record, which he obviously

10  now has.  But he also did have the additional consequence of

11  missing his grandfather's funeral during the time -- the four

12  months plus that he's been in custody.  He also was COVID

13  positive during the time he's been in custody.  Now,

14  thankfully, at least he's been vaccinated prior to coming to

15  the Court.

16       And I would request that the Court consider what would

17  either be a low end of four months, time served, or if the

18  Court did impose the downward adjustment for acceptance, time

19  served, which also is at four months.

20       The last thing I would note is that in a substantially

21  similar case, which I referenced in my papers, before Judge

22  Benitez, at 17-CR-4009 (BEN), Michael Angelo Ramirez is another

23  similar type of case of a laser being pointed at a CBP

24  helicopter in that case.

25       That gentleman had a criminal history category of III.

1  I'm obviously not privy to what his criminal history was, but

2  he was in a criminal history category of III, and a guideline

3  range of four to 10 months.  The government recommended six

4  months in that case, and that was a plea case.

5       Judge Benitez actually imposed five years probation.

6  So I do think that is something for the Court to consider in

7  determining what a fair and appropriate sentence would be.

8       THE COURT:  Let me ask you about one thing that you

9  said that I don't recall.  You said that the distance between

10 where Mr. Alvarez was and where he pointed the laser and the

11 helicopter was a mile.

12      I don't -- I recall that the helicopter was closer

13 than that at points.  Was there evidence that established that

14 was the closest the helicopter got, was a mile away from where

15 Mr. Alvarez was marching?

16      MS. SULLIVAN:  There was a significant -- I would

17 honestly have to pull up the documents to see, but it's very --

18 yes, it's, I believe, over 1700 -- over 1400 feet was the

19 closest that the helicopter was, but the elevation of the

20 helicopter --

21      THE COURT:  That doesn't get you to -- that doesn't

22 get you to a mile, does it?  1400 feet?

23      MS. SULLIVAN:  1760 feet, I believe, is a mile.

24      THE COURT:  Oh, 1760 is a mile.

25      MS. SULLIVAN:  I believe that's correct.  Actually,

 1  wait, I'm --

 2          THE COURT:  Yeah.  No, I don't think that's right

 3  either.

 4          MS. SULLIVAN:  Sorry, I'm confusing everything.

 5  That's with yards.

 6          THE COURT:  I'm thinking, you know, football -- yeah,

 7  football fields are -- yeah.

 8          MS. SULLIVAN:  I'm sorry, it's a quarter mile.

 9          THE COURT:  Yeah, so he was a quarter mile, roughly,

10  or more away.

11          MS. SULLIVAN:  Correct.

12          THE COURT:  All right.

13          MS. SULLIVAN:  It was at the lowest to the highest.

14          THE COURT:  Okay.  Anything else?

15          MS. SULLIVAN:  No, Your Honor.

16          THE COURT:  All right.  Mr. Alvarez, you have an

17  opportunity to speak today.  I would like to hear what you have

18  to say.

19          THE DEFENDANT:  I'd like to first start out by saying

20  that I've had the past four months to every day completely

21  think about what went down, and how it went.  And what mainly

22  came to my mind was how regretful and sorry I am to have put

23  somebody in -- in danger, or put them in an act of violence or

24  a crime, because I'm not a person that likes to put someone in

25  harm, because of what has been done to me since I've been

growing up. And I realize that those kind of actions have bad consequences. And that's not something that I like to put people in, or even any living being in.

I live a vegan lifestyle. I don't like to harm animals or anything of that nature. My girlfriend can attest to this, that I don't even kill bugs in the house. I just remove them.

So putting anything in harm is not something that I do. And it's been pretty much eating me up every day. I wake up, and that's what I think about. I go to bed, and that's what I think about.

But I'm very aware that actions have consequences, even in my ignorance of an action that I thought I wasn't putting anyone in harm, I realize that it does have a consequence. And that also eats me up.

But I've talked to many people in the system. And it's not a -- it's not a life that I could see myself living. And I've gotten a lot of advice from people to continue my life and stay out of trouble, to live my life and achieve what I really want in life.

And I'm not -- well, I'm used to learning lessons in a hard way. And I always take the silver lining in the lesson. And the silver lining in this lesson is to, once this is all over, whether it be time served, or however you think that it should be, that it's just motivated me to keep living and doing

```
1   life as I've been living it.  And getting what I want out of
2   life, and cherishing the ones around me that I miss.
3        And just living life as much as I can, and keeping
4   myself out of trouble and harm's way, and putting anybody else
5   in harm.  And, yeah, that's about all I have to say.
6        THE COURT:  All right.
7        THE DEFENDANT:  Thank you.
8        THE COURT:  Mr. Shapiro?
9        MR. SHAPIRO:  Thank you, Your Honor.  Shining a laser
10  pointer at an aircraft is very dangerous.  That was reflected
11  by the testimony of Officer Stevens, who was the pilot of the
12  helicopter in this case.  Congress, obviously, viewed it as
13  very dangerous, which is why they enacted Section 39(a).  And
14  that concern was also reflected in the comments of Congressman
15  Conyers that I included in the government's sentencing memo.
16        It's dangerous to the people in the aircraft, and it's
17  dangerous to the general public.  And that's particularly true
18  in this case, where the aircraft was flying over a protest of
19  thousands of people.
20        THE COURT:  Can I ask you about the -- can I ask you
21  about the guideline and the disagreement between the government
22  and the defense and probation, regarding the starting offense
23  level?
24        MS. SULLIVAN:  Yes, Your Honor.
25        THE COURT:  The caption for the section that both
```

1    sides and the probation department agree is applicable here

2    encompasses a number of discrete offenses aboard an aircraft,

3    or doing things to an aircraft, correct?

4              MS. SULLIVAN:  Yes.

5              THE COURT:  One of which is an interference with a

6    flight crew?

7              MS. SULLIVAN:  Yes.

8              THE COURT:  Interference with dispatch, navigation,

9    operation, or maintenance of an aircraft in flight?

10             MS. SULLIVAN:  Yes.

11             THE COURT:  In the continuum -- and I have been

12   involved with these cases before as a lawyer, but in the

13   continuum, it seems like it's a pretty wide continuum.  I mean,

14   a drunk on an airplane that's loud, and the flight attendants

15   tell him, you know, calm down, stay in your seat, that type of

16   thing, who doesn't heed their advice, that person, conceivably,

17   could be charged.  And this section would be applicable to that

18   person, right?

19             MR. SHAPIRO:  That's my understanding.

20             THE COURT:  Or somebody that gets in a fight with

21   another passenger.  We see that all the time, that some, you

22   know, disagreement, whether it's over masks or something else

23   develops.  And they get in a fight.  And the FBI is waiting to

24   grab them when they get off the plane.  That would be under

25   this section?

1      MR. SHAPIRO:  I believe so, although just to be frank

2  with Your Honor, I haven't looked at those statutes of those

3  offenses, and looked in the index, but I believe -- that's my

4  understanding.

5      THE COURT:  Well, interference with a flight crew

6  member is a big wide swath, right?

7      MR. SHAPIRO:  Yes.

8      THE COURT:  I mean, it can include much more serious

9  things, like threatening that you have a bomb or something like

10 that?

11     MR. SHAPIRO:  That sounds right.

12     THE COURT:  Yeah, I had a case like that once.

13     So the sticking point seems to be this mens rea

14 requirement.  The distinction between the starting offense

15 level 18 and 9.  9 is just generic.  If, you know, you've

16 committed some offense that falls under 2A5.2, 9 would be the

17 starting level, without any elaboration.  Under subsection 2,

18 it's a starting offense level of 18, if the person recklessly

19 endangered the safety of an airport or aircraft.  Now, that

20 seems pretty specific.  That would rule out things like causing

21 a disruption -- well, maybe not.  An aircraft, you could -- I

22 suppose you could still be charged with this, if you caused a

23 major disruption on an aircraft.

24     What evidence supports the recklessness?  That's

25 something beyond just mere knowledge that the laser is hitting

1  the helicopter, right?

2       MR. SHAPIRO:  Your Honor, I agree with defense counsel

3  that the Ninth Circuit's -- that the Gardenhire case is

4  applicable here.

5       THE COURT:  Right.

6       MR. SHAPIRO:  And what they talked about, and what

7  they said the government had to establish was that the

8  defendant had subjective awareness of the consequences.

9       THE COURT:  Yeah.  And you've pointed to the fact that

10 the defendant admitted watching, what, Hong Kong -- the use of

11 lasers during demonstrations in Hong Kong?

12      MR. SHAPIRO:  That is one of the pieces of evidence

13 that we believe supports his subjective awareness.

14      THE COURT:  And then you said that there's also --

15 there was also a label on his laser that said, danger, or

16 that -- you know, apparently, it had some kind of warning not

17 to point it at things or people?

18      MR. SHAPIRO:  It had a warning.  And that's another

19 detail that distinguishes it from the facts in the Gardenhire

20 case.

21      THE COURT:  So what else distinguishes -- what else

22 establishes recklessness on Mr. Alvarez's part here?

23      MR. SHAPIRO:  The other pieces of evidence that

24 establish Mr. Alvarez's subjective awareness of the

25 consequences are that he pointed it at his own eye.  That did

1    not happen in the Gardenhire case.

2         Again, as Your Honor pointed out, his laser, the

3    evidence showed, had a warning label that stated "danger" on

4    it.  He had an understanding and a belief that his laser was

5    effective at a distance.  The point of him bringing it to the

6    protest was to disable surveillance cameras, which would

7    indicate that he knew that if he pointed his laser at

8    something, it would hit it.

9         He admitted that his conduct was dumb.  Again, we

10   believe an acknowledgment that he knew it was dangerous, that's

11   why it was dumb.  He struck the helicopter.  And this is

12   another principal way, or key way in which this case differs

13   from the facts in the Gardenhire case.

14        From the moment -- for a period of 30 minutes,

15   Mr. Alvarez repeatedly, and in a prolonged manner, struck the

16   helicopter in this case.

17        THE COURT:  I can't remember, how many different

18   strikes to the helicopter?

19        MR. SHAPIRO:  It's not -- we couldn't count them in

20   that manner, Your Honor, because you'll recall that when the

21   helicopter's FLIR camera was in infrared function, it didn't --

22   you couldn't see the laser, because it only reflected heat.

23   And so they would toggle in-between the infrared functionality

24   and conventional video.  And it was on the conventional video

25   where you can see it.

1          But it's almost like -- there were many occasions when

2    they switched from infrared to video, where they switched to

3    video, and there's Mr. Alvarez's laser.

4          THE COURT:  So you can't give me a -- an accounting of

5    how many times?  I recall testimony, and seeing video of

6    surveillance of him.  Wasn't he pulling it out from under his

7    coat, and then putting it back in after he did it?

8          MR. SHAPIRO:  It appeared that he was just holding it

9    at his chest, Your Honor.

10          THE COURT:  Okay.

11          MR. SHAPIRO:  And pointing it.  And there was no

12    indication that I saw that he was putting it away.  But that --

13    leads to another piece of evidence that distinguishes this case

14    from Gardenhire, which is, the fact that he was doing it in a

15    surreptitious manner.  He was trying to hide his conduct,

16    which, again, is evidence that he knew it was dangerous.  Why

17    else would he try to hide it.  He knew it was wrong, and he

18    knew it was dangerous.

19          THE COURT:  All right.

20          MR. SHAPIRO:  And why else would he do it, to be

21    honest, over a period of such -- it would be pointless, really.

22    He was doing it over and over again.  And I believe he was

23    doing it, and I think the Court can conclude that he was doing

24    it, because he believed he was being successful.  He was

25    striking the helicopter with the laser.

1          And, Your Honor, those are -- just to point out, in

2   Gardenhire, the Court found that this enhancement didn't apply,

3   when there's really two key pieces of evidence.  One, that the

4   defendant shined the laser at the victim aircraft, it seems, at

5   most, a couple times.

6          And then the second thing is that the defendant in

7   that case, his friend had told him not to point it at

8   somebody's eyes.  That was it.  And it was based on that

9   evidence that the Ninth Circuit said, you cannot conclude that

10  the defendant had subjective awareness of the consequences.  We

11  believe this case is very different from that case.

12         THE COURT:  Gardenhire didn't arise in the -- in the

13  context of a protest march, right?

14         MR. SHAPIRO:  And that's another distinction.  It did

15  not, Your Honor.

16         THE COURT:  All right.  What else?

17         MR. SHAPIRO:  So those are the reasons that we believe

18  that the enhancement applies.

19         THE COURT:  You say enhancement.  It's not really an

20  enhancement.  It's just a different section.

21         MR. SHAPIRO:  Yes, Your Honor.

22         THE COURT:  It's not like 9, and add 9, if it's

23  reckless endangerment.  It's either 18, if it's reckless

24  endangerment, or 9, if it's not, right?

25         MR. SHAPIRO:  Correct.

1          THE COURT:  And do you -- Ms. Sullivan takes the

2     position that you have to prove, by clear and convincing

3     evidence, that that's the applicable standard.  Do you agree

4     with that?

5          MR. SHAPIRO:  I do agree that clear and convincing is

6     the standard the Ninth Circuit has set for this.

7          THE COURT:  Oh, for this?

8          MR. SHAPIRO:  Yes.

9          THE COURT:  Of the reckless endangerment, you mean?

10         MR. SHAPIRO:  Yes.

11         THE COURT:  So the factual finding of reckless

12    endangerment has to be supported by that?

13         MR. SHAPIRO:  Yes, Your Honor.

14         THE COURT:  But not the choice of that section --

15    subsection of the guidelines, right?

16         MR. SHAPIRO:  We have to establish, by clear and

17    convincing evidence, the facts that would lead Your Honor to

18    apply that subsection.

19         THE COURT:  Okay.  I mean, that's a different

20    understanding from the one I've had.  The understanding I've

21    had is if a Court varies from the guidelines -- first of all,

22    the Court has the obligation to choose the correct guideline

23    and apply the correct guideline.  I don't know that the Court

24    has said, you have to do that, and there has to be clear and

25    convincing evidence that you did that.

         I understand, with respect to adjustments, and the

Ninth Circuit has been kind of all over the board about this,

but generally speaking, an adjustment of six levels or more

requires a higher standard of proof, an adjustment to the

guideline, not a different guideline section.

         Your understanding is different.  That just in

choosing Section --

         MR. SHAPIRO:  I guess in --

         THE COURT:  The 2A5.2, subsection (2), which provides

an 18 level, versus section 4, which provides a 9 level, you're

saying that the Ninth Circuit has said, oh, in the application

of that guideline, it has to be more than just a correct

application.  It has to be by clear and convincing evidence?

         MR. SHAPIRO:  What the Ninth Circuit said is that the

government bore the burden of showing, by clear and convincing

evidence, that Gardenhire recklessly endangered the aircraft.

         THE COURT:  Was that an adjustment in Gardenhire, or

was it the selection of an applicable guideline from the

choices available?

         MR. SHAPIRO:  It was the latter, Your Honor.  It was

just as in this case.

         THE COURT:  Okay.

         MR. SHAPIRO:  I'm just relying on the Ninth

Circuit's --

         THE COURT:  Yeah, that -- I can't think of another

section where they say, you know, beyond correctly applying the
guidelines, you have to have a heightened standard of proof for
picking a particular guideline.

Adjustments are one thing to a guideline, but to say
that, oh, you've got to have clear and convincing evidence to
pick this guideline section over a different one?  But, you
know, if you make that concession, then I'll accept it.

MR. SHAPIRO:  I feel constrained by the opinion.  I
understand what Your Honor is saying, but --

THE COURT:  Yeah, I don't -- I mean, I haven't found
that anywhere in the guideline book.  And I can't say I read it
all the time, but -- anyway, go ahead.

MR. SHAPIRO:  And so those are the reasons.  That's
really, I think, the -- that's why we think that particular
guideline applies, Your Honor.  If Your Honor wants me to speak
to the issue of acceptance, I don't think it could be any
clearer that the defendant went to trial to contest the
principal element of the offense, which is knowingly aiming the
laser at the aircraft.

And I pointed out from the trial transcript the
arguments made by counsel both in opening statement and in
argument at the end, as well as the evidence presented by the
one fact witness that it did not indicate acceptance at all.
And he was seeking to avoid the consequences and avoid being
held accountable for his conduct.

1          THE COURT:  Yeah.  Did it come out in the context of

2     his post-arrest statement that he initially claimed he got it

3     to -- as a play thing with cats?

4          MR. SHAPIRO:  He said that.  And he was asked, then,

5     whether he had cats, and he said he did not.

6          THE COURT:  Yeah.

7          MR. SHAPIRO:  He said he has friends who has cats.

8          THE COURT:  Yeah.  But did that come out -- he didn't

9     testify, correct?

10          MS. SULLIVAN:  Correct.

11          THE COURT:  Did that come out in the context of

12     offering post-arrest statements, that one of the things he said

13     was that he got it for -- to play with cats?

14          MR. SHAPIRO:  He said it.  I don't think we presented

15     that piece of his -- part of his post-arrest statement at

16     trial.

17          THE COURT:  Do you remember that?  Did any of that

18     come out, Ms. Sullivan, or no?  Ms. Khan is shaking her head

19     no.  I frankly just don't recall on that point, but --

20          MS. SULLIVAN:  It did not.

21          THE COURT:  Okay.  All right.  Anything else,

22     Mr. Shapiro?

23          MR. SHAPIRO:  No, Your Honor.

24          THE COURT:  All right.  Let me deal with the guideline

25     section to begin with.  I mean, it really strikes me as

1    strange, you both tell me that this is required, that the Court

2    has to make a decision about the applicable guideline, not just

3    be correct about it, but be convinced clear -- by clear and

4    convincing evidence --

5              PROBATION OFFICER:  Your Honor, Amberly Alvarado with

6    the probation office.  I just want to note on page 489, the

7    bottom paragraph of the guidelines manual, "the Commission

8    believes that the use of the preponderance of the evidence

9    standard is appropriate to meet the due process requirements

10   and policy concerns in resolving disputes regarding application

11   of the guidelines to the facts of the case."

12             THE COURT:  Yeah, that's contrary to what I'm being

13   told, though.  I'm being told that, oh, no, if you pick this

14   guideline, you have to be convinced by clear and convincing

15   evidence that it's the correct one.

16             Do you have a copy of the guidelines manual there?

17   The probation officer has correctly recited it.  It says, "the

18   Commission believes the use of preponderance of evidence

19   standard is appropriate to meet due process requirements and

20   policy concerns in resolving disputes regarding applications of

21   the guidelines to the facts of the case."

22             That would cut against that.  If the Ninth Circuit

23   ruled clear and convincing, they're obviously in disagreement

24   with the Sentencing Commission as to that --

25             MS. SULLIVAN:  The only thing I would note, Your

1  Honor, is that that is the normal standard.  And it is the case

2  when a guideline substantially increases the guideline range,

3  if it doubles it or triples it, that it increases the burden on

4  the government.

5         So my guess is that that's why the Ninth Circuit found

6  in Gardenhire that it needs to be by a clear and convincing

7  standard.

8         THE COURT:  All right.

9         MR. SHAPIRO:  And maybe I can say one thing that will

10  help at least clarify it somewhat.  I mean, the Ninth Circuit

11  did -- in Gardenhire, it said -- it was the district court

12  itself that had imposed that burden on itself.  And the Ninth

13  Circuit said that the district court had correctly concluded

14  that.  But it does appear that the district court did not

15  correctly conclude that, based on our reading of the

16  guidelines.

17         THE COURT:  Well, okay.  One of the things I can do

18  when there's a guideline dispute, and I'm not certain about it,

19  is to calculate the guidelines both ways, and determine whether

20  it makes a difference in the sentence.  And so I intend to do

21  that here.

22         First, the Court adopts the guideline urged by the

23  government.  I do think, and I find this by clear and

24  convincing evidence, that there was reckless endangerment

25  involved in this.  The defendant's post-arrest statement

1    indicated that he watched how lasers were being used to prevent

2    cameras from seeing faces during protests in Hong Kong.

3           The defendant did say, as Mr. Shapiro pointed out,

4    that he'd pointed the laser at his own eyes and it hurt his

5    head, and he understood how it would make someone feel when he

6    pointed it at the helicopter.

7           I don't think he got the laser to play with cats.  I

8    think he got the laser, and the timing of the evidence on this,

9    was that he got it shortly before -- shortly before this

10   protest, but after seeing -- in which he was involved, but

11   after seeing the Hong Kong protest.  So I honestly believe that

12   he got that maybe not to point at helicopters, but certainly to

13   point at cameras, to try to throw them off, so they couldn't

14   show faces.

15          And then the testimony about his actions, and holding

16   it close to his face -- or close to his chest, and then pulling

17   it out from time to time, to me, evinces an awareness on his

18   part of the danger of that, and the liability that he would

19   have for pointing it at a helicopter.

20          And if he was aware of that at the time, one has to

21   say, well, what else were you aware of?  I mean, why were you

22   holding it close to your chest?  Because you thought you might

23   be arrested for pointing this at a helicopter?  And why would

24   you be arrested?  Because it's dangerous to point it at a

25   helicopter in flight.

1        So all of those facts, and I listened very carefully

2   to the evidence, I listened to the witnesses on both sides,

3   convinced me clearly, clearly that the defendant knew of the

4   potential for this to do great harm to an aircraft in flight.

5        I mean, it's one thing to say, I pointed it at my own

6   eyes on the ground, where I've got my feet, and if I fall, I

7   can fall on the ground.  It's another to say, knowing the

8   effect on me, giving me a headache like that, and then pointing

9   it up at an aircraft in flight.  If that doesn't evince an

10  understanding of the danger involved and the recklessness in

11  pointing it at an aircraft in flight, then nothing does.

12       So assuming I have to make this finding by clear and

13  convincing evidence that the defendant appreciated that his

14  acts amounted to reckless endangerment of a helicopter, I make

15  that finding.  The starting point is 18, if that scenario is

16  correct.  And I believe it to be so.

17       As far as acceptance of responsibility, I don't find

18  that this is one of the rare cases where the defendant's

19  accepted responsibility.  You know, for one thing, as I said,

20  Ms. Sullivan points to his statement being entirely

21  forthcoming.  Well, yes, he came around to admitting that he

22  did this.  But he was sort of caught red-handed.  There were

23  people on the ground, and he got grabbed right away.

24       And one of the things he said, of course, is, well, I

25  got this for cats.  I didn't believe that.  I didn't believe it

1  when I heard it the first time.  I don't believe it today.  I

2  don't think it had anything to do with cats, or making a cat

3  chase a laser mark on the ground.  I think that the timing of

4  his acquisition of this on Amazon was all geared toward his

5  intended participation in a -- in a protest march.  And he had

6  seen protests march with these lasers used.  And I think that's

7  why he acquired it, and that's why he had it on the night that

8  he did.

9       So, you know, part of that post-arrest statement, I

10  don't believe was true.  I don't believe it was credible, that

11  this had anything to do with playing with cats.

12       Defendant's in criminal history category I, level 18.

13  The guidelines would be 27 to 33 months.  If I embrace the no

14  reckless endangerment, then the guidelines would begin at 9.

15  I'd make the same finding with respect to acceptance of

16  responsibility, but the guidelines would be lower.  They would

17  be four to 10 months.  Four to 10 versus 27 to 33 months.

18       Let me turn now to the 3553 factors.  Concluding, as I

19  did, that it's subsection 2 that applies, but, again,

20  alternatively embracing the notion that it might just be a 9 as

21  a starting level.  So I have both guideline ranges in mind.

22       This was -- this was a protest -- as I recall,

23  Ms. Sullivan, this was the George Floyd aftermath and the

24  protest for that.

25       MS. SULLIVAN:  That's correct, Your Honor.

1        THE COURT:  Yeah.  So look, you know, a couple of
2   points here.  We're living in very contentious times.  People
3   don't agree with each other on politics or, you know, their
4   world view, things like that.  And emotions run high.  And I
5   don't doubt that Mr. Alvarez, he's explained, you know, his
6   philosophy of life.

7        He doesn't want to hurt a thing.  He's a vegan.  He
8   doesn't even squash bugs.  You know, I don't think he's a
9   malicious person.  And I think he was caught up in the moment.
10  I think he was upset about what had happened, and that's what
11  caused him to join this.

12       Unfortunately, you know, that very protest sort of
13  pitted people against police.  And there was this anti-police
14  thing.  And from that I can understand how, you know, one would
15  want to, you know, maybe, you know, make some statement to the
16  police, either, you know, yelling at police or not following
17  instructions or, you know, ultimately, shining a
18  flashlight -- excuse me, a laser up at what is known to be a
19  police helicopter.

20       It doesn't justify any of it, but it's context here.
21  You know, he didn't set out one night by himself and a friend,
22  you know, to try to cause a helicopter to fall out of the sky.
23  You know, I think he was caught up in the moment and in the
24  protest.

25       And as he admitted, these laser pointers had been part

1  of other protests that he had seen and witnessed.  I think

2  that's why he got the laser.  I think that's why he brought it

3  with him.

4          MS. SULLIVAN:  Your Honor, I'm sorry, if I could just

5  clarify one fact.  His statements, as far as buying the laser

6  and seeing the laser in protests --

7          THE COURT:  Yes.

8          MS. SULLIVAN:  -- was to shine at surveillance

9  cameras.

10          THE COURT:  Right.

11          MS. SULLIVAN:  Like, towards surveillance cameras.

12          THE COURT:  Right.  I know he never said that I bought

13  it to shine at a helicopter.  I know he said that it was to

14  throw off cameras that could otherwise get facial recognition.

15  And that may have been why he had it.

16          In fact, you argued, although I didn't see any

17  evidence of it at the trial, that that's actually what he was

18  trying to do, was point it at a street light that you said had

19  a camera on it.  I didn't think there was any evidence of a

20  camera.  And I didn't see much -- you know, we saw the photos

21  of the -- of the protest march area.  I didn't see too many

22  street lights.  But I remember, at one point, you suggested

23  that, well, it just bounced off the street light and

24  accidentally hit the helicopter.

25          I don't find that to be the case.  I think he

deliberately pointed it at the helicopter, but I take your
point.  He never said, I bought it to shine at a helicopter.
But he did that.  I find he did that, and I find he willfully
did that.  And I find, as Mr. Shapiro points out, that he was
aware that it was hitting the helicopter when he did it.  And
he did it multiple times.

Again, back to what I was saying, the context is
important here.  It doesn't excuse what he did.  It doesn't
make it justifiable.  But it does put it in a different
category for me than somebody who just, you know, seeks to do
harm to police, and is out, you know, shining the light, or
maybe somebody that is so cynical and so malevolent that they
would seek to actually cause an airplane to crash or a
helicopter to crash.

I don't put him in either of those categories.  I
think he was caught up in the moment.  I think he brought the
laser along, so that he could prevent, you know, facial
recognition, if there was to be -- be that.  And the helicopter
provided an opportunity for him to, you know, maybe manifest
the frustrations he was feeling that caused him to be in
the -- in the protest march to begin with.

That's his business.  I don't hold any of that against
him, of course.  But, you know, he crossed the line when he
pointed the laser up at the helicopter.  And he did it multiple
times.  And that was very dangerous.  And you say, Mr. Alvarez,

1    that, you know, you go to bed every night, you wake up every

2    morning, thinking about this.

3           Put it -- you know, put it in the context of your own

4    experience with pointing that laser in your eye, and saying,

5    man, it gave me a headache, it hurt.  You know, you wouldn't

6    want to point that at somebody that's trying to operate a

7    helicopter.  I hope that's one of the things that you've

8    concluded now, you know, in your reflection on this.

9           As far as what the jurors say regarding punishment,

10   well, there's a reason that they're fact finders, and that they

11   don't impose the sentence in these cases.

12          Congress has clear authority.  The case did belong in

13   federal court.  Everyone, I suppose, is entitled to his or her

14   opinion, but in the end, you know, the jurors found Mr. Alvarez

15   guilty of this offense.

16          He doesn't have a prior record.  He's got a good work

17   history.  The people that have written the letters, and

18   Ms. Sullivan tells me that there are many more letters that she

19   could have submitted to the same effect, all suggest that this

20   really is aberrational conduct on Mr. Alvarez's part.  And I

21   take him at his word today that it's aberrational conduct, from

22   which he's learned a lesson, and he wouldn't do this again.

23          Whether he participates in protests is up to him, but,

24   you know, you don't shine lasers up at aircraft in flight.  You

25   just don't do that.  And I think he realizes that.

1    So the question is, you know, would any more time in

2  jail do any good.  I don't think so.  He went to custody as

3  soon as the jury rendered its verdict.  He's been in during

4  what you point out to be a -- you know, a very tough time to do

5  custody with the threat of COVID infection in close quarters.

6  And, in fact, you know, he's living proof of the threat,

7  because he got COVID while he was in custody.

8    Fortunately young enough that he didn't have to go to

9  the hospital, didn't have to be on a ventilator, and came

10  through it.  But for a guy that's not been in jail before, and

11  about whom all these very praiseworthy things have been said by

12  people that have known him for a long time, I think the point's

13  been made, that what he did was in error.  And I don't think

14  you'll repeat anything like this.

15    You won't do that, will you?

16    THE DEFENDANT:  Absolutely not.

17    THE COURT:  Okay.  So, again, going back to the two

18  guideline ranges.  If I start at the one that I find to be

19  applicable, the 27 to 33, the Court finds that the objectives

20  of sentencing in this case are served by placing the defendant

21  on probation, that no additional time in custody is necessary

22  to fulfill the objectives of sentencing.

23    If I adopt the 9 level starter, then, as Ms. Sullivan

24  points out, he's already done more than the four months.  And I

25  would also find the objectives of sentencing, even if that's

1  the starting guideline, are served by placing him on probation

2  for five years.

3          So I get to the same result regardless of which

4  guideline I apply.  Again, I say that, I'm not wavering, I

5  think the 18 level is the starting point on this one.

6          Conditions of probation are these:  Obviously, I'm not

7  going to forbid you from having lasers anymore.  I don't know

8  what use they'd be to you, but you're not to point lasers at

9  flying objects, particularly at aircraft.

10          You're subject to search by the probation officer,

11  that includes your person, your property, your residence, and

12  your vehicle.

13          I don't know about -- what's the -- what's the basis

14  for the participate in cognitive behavioral treatment?  I'm a

15  little worried about that, because I've disclaimed any

16  intention to rely on whatever his beliefs are, and send him to

17  see shrinks because he marched in the George Floyd parade, I

18  don't want to do that.  I'm not inclined to do it.  But what

19  benefit would there be from cognitive behavioral treatment

20  here?

21          PROBATION OFFICER:  It would just be, like, how he

22  admitted earlier that his bad decision and thinking led him to

23  use the laser in such manner.  It's more of, like, helping him

24  more through his thinking patterns, not necessarily a treatment

25  program for, like, mental health.

1          THE COURT:  Okay.  Do you think you'd benefit from

2     that?  I don't want to stick you with it.  I mean, it seems

3     like you've reached a point of self-realization about this,

4     that this was wrong, that you shouldn't have done this.

5          THE DEFENDANT:  It's not a pattern where I'm doing a

6     lot of errors.  It was just the one error, so --

7          THE COURT:  Okay.  I won't -- I won't do that.  I want

8     you to -- you've got a full-time job you can go back to?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Okay.  I want you to maintain full-time

11    employment or schooling, or some combination of those.

12         I decline to fine him.  Probation has recommended a

13    $2,000 fine.  I think the time he's been in custody and the

14    circumstances under which he was incarcerated amount to enough

15    punishment for this.

16         I do impose a hundred dollar penalty assessment that

17    comes with a felony conviction.  You're to pay that within 60

18    days.  Do you accept probation on those conditions?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  Okay.  Anything else, Ms. Sullivan, on

21    this?  I know I have to advise the defendant of his appellate

22    rights, and I intend to do that.  But anything beyond that?

23         MS. SULLIVAN:  No, Your Honor.

24         THE COURT:  Anything else from the United States?

25         MR. SHAPIRO:  No, Your Honor.

1     THE COURT:  So, Mr. Alvarez, you have the right to

2  appeal.  That would include your conviction and it would

3  include the sentence that I've just imposed, although I

4  essentially imposed the sentence that your lawyers asked me to

5  impose.  But if you think there was fault with any of that,

6  then you have the right to appeal.

7     You have to file your notice of appeal within 14 days

8  of today's date.  Ms. Sullivan will help you with that.  If you

9  want to appeal, you tell her.  She'll file the paperwork and

10  the appeal will be underway.

11     Don't blow the deadline, though.  14 days is the

12  deadline for you to make up your mind, and instruct her what

13  you want to do, okay?

14     PROBATION OFFICER:  Your Honor, may I just -- I just

15  wanted to clarify, that was -- how many years?  Was it five

16  years?

17     THE COURT:  Five years, yeah.

18     PROBATION OFFICER:  Okay.  And also, I would like to

19  provide him with reporting instructions.

20     THE COURT:  Okay.  She's going to give you a paper.

21  Once you get out of custody, within 48 hours, I want you to

22  report to probation.  Does he have to call or come in

23  personally?

24     PROBATION OFFICER:  He can call, Your Honor.

25     THE COURT:  Okay.  The number is on there?

                1          PROBATION OFFICER:  Yes, Your Honor.

                2          THE COURT:  Okay.  So call probation.  You'll get

                3   further instructions from them.

                4          MS. SULLIVAN:  Your Honor, if it's possible for me to

                5   inquire, he has been housed at CCA, but I'm not sure if they're

                6   going to transport him to San Luis since he came to Court.  If

                7   it's possible for him to be released from --

                8          THE COURT:  Where's his property?  Do you have any

                9   property in custody?  Just that?

               10          THE DEFENDANT:  No, just what I have on me, yeah.

               11          THE COURT:  Okay.  Do the marshals know of any reason

               12   why he can't be released here?

               13          THE MARSHAL:  I can find out, Your Honor.

               14          THE COURT:  Okay.  The Court would order, you know,

               15   unless it's some great violation of the protocol that he be

               16   released here from San Diego, rather than send him all the way

               17   back to San Luis -- you have people here that can pick you up

               18   and so on?

               19          THE DEFENDANT:  Yes.

               20          THE COURT:  Okay.  So I'd ask that he be processed

               21   here and released from here.

               22          MS. SULLIVAN:  Thank you, Your Honor.

               23          THE COURT:  Okay.  Good luck, Mr. Alvarez.  No more

               24   problems now.  No more laser pointing.

               25          THE DEFENDANT:  You got it.

1          THE COURT:  All right.

2          MS. SULLIVAN:  Thank you, Your Honor.

3          MR. SHAPIRO:  Thank you, Your Honor.

4     (The proceedings concluded at 3:40 p.m., March 22, 2021.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3       I, CYNTHIA R. OTT, Official Court Reporter, United States

4    District Court, Southern District of California, do hereby

5    certify that pursuant to 28 U.S.C. §753 the foregoing is a

6    true, complete and correct transcript of the stenographically

7    reported proceedings had in connection with the above-entitled

8    matter and that the transcript page format is in conformance

9    with the regulations of the Judicial Conference of the United

10   States.

11

        DATED at San Diego, California, April 25, 2021.

12

13

14                         _____/s/ CYNTHIA R. OTT_____
                           CYNTHIA R. OTT, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25